NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-563

IN RE THE COMMISSION'S INVESTIGATION INTO RPA ENERGY, INC.'S COMPLIANCE WITH THE OHIO ADMINISTRATIVE CODE AND POTENTIAL REMEDIAL ACTIONS FOR NONCOMPLIANCE; RPA ENERGY, INC., D.B.A. GREEN CHOICE ENERGY, APPELLANT; PUBLIC UTILITIES COMMISSION OF OHIO, APPELLEE; OFFICE OF THE OHIO CONSUMERS' COUNSEL, INTERVENING APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *In re RPA Energy, Inc.*, Slip Opinion No. 2026-Ohio-563.]

*Public utilities—Public Utilities Commission gave provider of competitive retail electric service and competitive retail natural-gas service sufficient notice of allegations lodged against it for unfair, deceptive, or unconscionable acts or practices under Adm.Code 4901:1-21-05-(B)(8)(a) and Adm.Code 4901:1-29-05(D)(8)(a) before rescinding the provider's Ohio operating certificates under R.C. 4928.08(D) and 4929.20(C)(1) for committing statutory and rule violations—Commission failed to sufficiently explain basis of its forfeiture order in violation of R.C. 4903.09 and ordered*

*consumer rerating for contradictory periods, necessitating remand so it may explain and clarify those decisions—Order affirmed in part and reversed in part and cause remanded to commission.*

(No. 2024-0236—Submitted September 17, 2025—Decided February 24, 2026.)

APPEAL from the Public Utilities Commission, No. 22-441-GE-COI.

_____

HAWKINS, J., authored the opinion of the court, which KENNEDY, C.J., and FISCHER, DEWINE, BRUNNER, CROUSE, and SHANAHAN, JJ., joined. CANDACE C. CROUSE, J., of the First District Court of Appeals, sat for DETERS, J.

**HAWKINS, J.**

{¶ 1} Appellee, the Public Utilities Commission of Ohio (the "commission" or "PUCO"), certified appellant, RPA Energy, Inc., doing business as Green Choice Energy ("RPA"), as a competitive retail electric-service ("CRES") provider and a competitive retail natural-gas-service ("CRNGS") provider. After RPA's certification, the commission received consumer complaints and other information indicating that RPA and its vendors engaged in illegal door-to-door solicitation and telemarketing practices, such as spoofing phone numbers, altering call recordings, and soliciting door-to-door during the COVID-19 pandemic in violation of commission orders. The commission opened an investigation into RPA and, following an evidentiary hearing, found that RPA had violated numerous commission rules. The commission rescinded RPA's certificates and ordered it to stop operating in Ohio; it also ordered RPA to pay a forfeiture of $1.44 million and to "re-rate" consumers who were enrolled with RPA and provide restitution to those consumers. 2023 Ohio PUC LEXIS 1037, *66-69 (Oct. 18, 2023).

{¶ 2} RPA appealed to this court, arguing that the commission did not provide it with proper due process, that the commission's findings were not supported by the evidence and not clearly articulated in its opinion and order, and

2

that the remedies ordered by the commission are unlawful and not supported by evidence. We granted the motion to intervene as appellee filed by the Office of the Ohio Consumers' Counsel ("OCC"). 2024-Ohio-5173.

{¶ 3} For the reasons stated below, we affirm the commission's order in part and reverse it in part and remand the cause to the commission. Specifically, we affirm the commission's order rescinding RPA's operating certificates. But we reverse the commission's order directing RPA to pay a forfeiture and to rerate consumers. We remand the cause to the commission with instructions to identify and thoroughly explain the evidence used to support the amount of the forfeiture and to clarify which consumers it is ordering RPA to rerate.

## I. LEGAL, FACTUAL, AND PROCEDURAL BACKGROUND

### A. Legal framework

{¶ 4} "Consumers have the option of purchasing electricity either from their local 'distribution utility'—which also provides the infrastructure that delivers the electricity to the end-user—or through a host of [CRES] providers." *In re Application of FirstEnergy Advisors for Certification as a Competitive Retail Elec. Serv. Power Broker & Aggregator*, 2021-Ohio-3630, ¶ 5. Similarly, consumers may purchase natural-gas services from CRNGS providers. *See In re Complaint of Buckeye Energy Brokers, Inc. v. Palmer Energy Co.*, 2014-Ohio-1532, ¶ 1.

{¶ 5} The commission must issue operating certificates to both CRES and CRNGS providers before they may operate in this State. R.C. 4928.08(B)(1)[1] and

---

1. The General Assembly revised R.C. 4928.08, effective August 14, 2025. Division (B) of the version that was in effect when the commission issued the order on appeal here has been renumbered as division (B)(1). *Compare* R.C. 4928.08(B)(1), 2025 Sub.H.B. No. 15, *with* former R.C. 4928.08(B), Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962, 8005. All references to R.C. 4928.08 in this opinion are to the revised version unless otherwise noted.

4929.20(A)(1)[2]; *see also Buckeye Energy Brokers* at ¶ 5. To obtain certification, an aspiring provider must demonstrate its "managerial, technical, and financial capability" to provide competitive retail-electric or competitive natural-gas-retail service. R.C. 4928.08(B)(1) and 4929.20(A)(1). The certification requirements "are designed to ensure that companies are credible and capable of delivering the services they offer and to protect customers and incumbent distribution utilities from default." *Buckeye Energy Brokers* at ¶ 1.

{¶ 6} The commission continues to monitor CRES and CRNGS providers after certification. It has jurisdiction to hold hearings and issue orders either on its own initiative or complaint or upon receiving a complaint alleging that a CRES or CRNGS provider has violated or failed to comply with any statute under R.C. 4928.01 to 4928.15 or R.C. 4929.20 to 4929.23, respectively, or any associated commission rule. *See* R.C. 4928.16(A)(2) and 4929.24(A)(2). Among other things, a provider may not engage in marketing or solicitation acts that are "unfair, misleading, deceptive, or unconscionable," Adm.Code 4901:1-21-05(B) and 4901:1-29-05(D); *see also* R.C. 4928.08(D). If, after a hearing, the commission finds that a provider committed a statutory or rule violation, it may order various remedies, including rescission of contracts, payment of restitution to consumers, forfeiture, and revocation of a provider's certificate to operate. *See* R.C. 4928.16(B) and 4929.24(B).

## B. Factual and procedural background

{¶ 7} The commission first certified RPA as a CRES and CRNGS provider in Ohio in 2016. RPA solicits consumers door-to-door and through telemarketing, using vendors to contact consumers on its behalf.

---

2. The General Assembly revised R.C. 4929.20, effective August 14, 2025. Division (A)(1) under the revised version is substantively unchanged from division (A) of the version that was in effect when the commission issued the order that is on appeal here. *Compare* R.C. 4929.20(A)(1), 2025 Sub.H.B. No. 15, *with* former R.C. 4929.20(A), 149 Ohio Laws, Part II, 3857, 3879. All references to R.C. 4929.20 in this opinion are to the revised version unless otherwise noted.

{¶ 8} Between January 1 and July 20, 2021, the commission's staff ("staff") received 25 consumer complaints or other contacts about RPA. The complainants alleged that RPA had enrolled them for service with RPA without authorization and that RPA's sales agents had deceived them by misrepresenting that they were employed by a governmental entity or utility. In addition, RPA solicited a commission employee by phone—apparently unaware of that person's employment with the commission. The employee believed the solicitation was misleading. Based on these contacts, staff opened an investigation of and requested data from RPA. RPA provided some of the requested data, but it refused to provide some of the requested data kept by its vendors, claiming that it was not obligated to do so.

{¶ 9} Based on its investigation, in October 2021, staff sent RPA a written notice of "probable non-compliance with certain sections of the Ohio Administrative Code." In the notice, which was supported by over 1,400 pages of documentation, including consumer complaints, staff alleged that RPA had committed numerous statutory and rule violations. Staff and RPA attempted to resolve the issues but were unable to do so. In April 2022, the commission set the matter for a hearing to determine if RPA had violated the statutes and rules as alleged. The commission stated in its scheduling entry that if violations were found, the commission had the authority to rescind RPA's operating certificates and consumer contracts, order a forfeiture, and order that RPA make restitution to its consumers.

{¶ 10} On June 10, 2022, staff filed a 1,440-page report, which included the notice of probable noncompliance that had been sent to RPA. In its report, staff alleged that RPA had committed 20 separate violations of commission rules and one statutory violation. For example, it alleged that RPA (1) had changed consumers' retail electric-service suppliers without their consent, in violation of Adm.Code 4901:1-21-03(C); (2) had failed to disclose all terms, conditions, and limitations of their services, in violation of Adm.Code 4901:1-29-05(D)(2); (3) had

led consumers to believe that RPA was representing another entity, in violation of Adm.Code 4901:1-29-05(D)(5); and (4) had not properly recorded or maintained recordings of consumer-verification calls, in violation of Adm.Code 4901:1-21-06(D)(2)(b) and 4901:1-29-06(E)(2). In addition to specific rule violations, staff also alleged that RPA lacked managerial capability.

{¶ 11} The commission granted OCC's motion to intervene as a party, over RPA's objection. About three months before the hearing, staff amended its report, alleging several new violations. And on October 26 and November 10, an attorney examiner conducted a two-day hearing.

{¶ 12} The commission issued an opinion and order on October 18, 2023, finding that RPA had violated numerous statutes and commission rules. The commission rescinded RPA's operating certificates and assessed RPA a $1.44 million forfeiture. 2023 Ohio PUC LEXIS 1037 at *69. It also ordered RPA to rerate and provide restitution to certain consumers. *Id.* at *66, 69.

{¶ 13} RPA timely filed an application for rehearing with the commission under R.C. 4903.10. The commission granted the application "for the limited purpose of further consideration of the matters specified therein." 2023 Ohio PUC LEXIS 1210, *5 (Dec. 13, 2023). On February 13, 2024, RPA appealed to this court. The commission and OCC filed a joint motion to dismiss the appeal, arguing that we lacked jurisdiction over the appeal because the commission had not yet ruled on the merits of the rehearing application. On October 30, we denied the motion to dismiss "on the authority of *In re Application of Moraine Wind*, *L.L.C.*, 2024-Ohio-3224." 2024-Ohio-5173.

{¶ 14} On appeal to this court, RPA raises three propositions of law: (1) by failing to follow the procedural statutes and rules governing commission proceedings, the commission failed to provide RPA with the requisite due process, (2) the commission's findings of fact and conclusions of law lack supporting rationale or a properly developed record and to the extent the findings or

conclusions are discernible, they are against the manifest weight of the evidence, and (3) the remedies imposed by the commission are "unsupported, unlawful, and represent an abuse of discretion."

## II. LEGAL ANALYSIS

### A. Standard of review

{¶ 15} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 2004-Ohio-6767, ¶ 50. The appellant bears the burden of demonstrating that the commission's decision is unlawful or unreasonable. *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.*, 51 Ohio St.3d 150, 154 (1990).

{¶ 16} The term "unlawful" in the standard-of-review context refers to this court's review of legal questions, such as the proper interpretation of a statute or whether the commission followed the procedures prescribed by statute or commission rules. *See In re Application of Firelands Wind, L.L.C.*, 2023-Ohio-2555, ¶ 12; *In re Application of Alamo Solar I, L.L.C.*, 2023-Ohio-3778, ¶ 11. Our review of legal questions is de novo. *Id.*

{¶ 17} A commission order is unreasonable when it is manifestly contrary to the evidence in the record, when the evidence is clearly insufficient to support the decision, or when it is internally inconsistent. *See Firelands Wind* at ¶ 16. Additionally, a commission order is unreasonable when the commission's exercise of its discretion in making determinations within broad statutory criteria falls outside the zone of permissible statutory construction. *Id.* at ¶ 15.

{¶ 18} In adjudicating whether a commission order is unreasonable, we do not reweigh the evidence or second-guess the commission on questions of fact. *In re Complaints of Lycourt-Donovan v. Columbia Gas of Ohio, Inc.*, 2017-Ohio-7566, ¶ 35. We will not disturb the commission's factual determinations when the record contains sufficient probative evidence to show that the commission's

decision "is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty." *Columbus v. Pub. Util. Comm.*, 58 Ohio St.2d 103, 104 (1979).

## B. Due process

{¶ 19} Under its first proposition of law, RPA asserts that the commission did not follow the procedural statutes and rules governing commission proceedings and thus denied it due process. We reject each of RPA's four arguments under this proposition.

### 1. Reasonable notice of the alleged violations

{¶ 20} R.C. 4928.08(D) and 4929.20(C)(1), respectively, provide that the commission may revoke a CRES or CRNGS provider's certification "if the commission determines, after reasonable notice and opportunity for hearing, that [the provider] has failed to comply with any applicable certification standards." RPA argues that the commission did not provide it with reasonable notice of the specific violations alleged against it and thus failed to provide it with due process.

{¶ 21} The commission contends that it provided RPA with proper notice of the alleged violations. Over a year before the hearing, staff provided RPA with a written notice setting out the allegations of probable noncompliance. It identified individual consumer calls and complaints, included over 1,400 pages of records documenting the alleged violations, and listed the alleged statutory and rule violations. About four months before the hearing, staff filed with the commission a 1,440-page report, which included a copy of the notice of probable noncompliance sent to RPA; this was followed a month later by staff's amendment to its report, identifying several additional alleged violations. And approximately three weeks before the hearing, staff provided the commission and RPA with its prefiled testimony outlining the allegations against RPA; this filing included a flash drive containing audio files and consumer case numbers.

**{¶ 22}** RPA argues, however, that these productions did not provide it with sufficient notice of the alleged violations. It argues that the staff report was required to explicitly state for each consumer the violations that RPA allegedly committed with respect to that consumer. Nothing in R.C. 4928.08(D) or 4929.20(C)(1) requires the commission or its staff to provide that level of detail. RPA cites two commission cases in support of the proposition that a party's failure to "identify which rules were allegedly violated, how many times each rule was allegedly violated, and what evidence in the complaint files supports each alleged violation precludes [the opposing party] from [having] the opportunity to respond to those allegations," *In re Verde Energy*, PUCO No. 19-958-GE-COI, 2020 Ohio PUC LEXIS 910, *34 (Feb. 26, 2020); *In re PALMco Power*, PUCO No. 19-957-GE-COI, 2020 Ohio PUC LEXIS 1032, *27 (Jan. 29, 2020).

**{¶ 23}** Here, staff did cite the statutes and rules that it alleged RPA had violated, and staff identified representative consumer complaints for each alleged violation. It then provided RPA with over 1,400 pages of documentation supporting the allegations.

**{¶ 24}** Moreover, three weeks before the hearing, staff provided RPA with a spreadsheet listing each individual violation alleged. The commission relied heavily on this spreadsheet in support of its forfeiture order, but, as discussed below, it is essentially impossible to determine from the commission's description of the spreadsheet in its order which specific violations the commission found. However, those ambiguities do not create a due-process issue. Staff provided the spreadsheet to RPA before the hearing, and to the extent that RPA had questions about it, RPA could have posed those questions to staff or elicited testimony from staff witnesses about the spreadsheet at the hearing. Further, RPA did not object to the introduction of the spreadsheet into evidence at the hearing. And the spreadsheet was only supplemental to the amended staff report, which provided

over 1,400 pages of evidence supporting the allegations that RPA had violated statutes and commission rules.

{¶ 25} Based on these filings, we conclude that the commission complied with R.C. 4928.08(D) and 4929.20(C)(1) by providing RPA with "reasonable notice and opportunity for hearing."

*2. RPA's right to discovery*

{¶ 26} "All parties and intervenors shall be granted ample rights of discovery" in commission proceedings. R.C. 4903.082. The commission has adopted rules providing that with some exceptions, staff itself is not considered a party to commission proceedings, Adm.Code 4901-1-10(C), and that certain discovery requests may be made only to parties, *e.g.*, Adm.Code 4901-1-16(C). RPA argues that these rules effectively exempt staff from participating in discovery, violate due process, and conflict with the directive in R.C. 4903.082 that "all parties shall be granted ample rights of discovery." RPA cites *State ex rel. Celebrezze v. Natl. Lime & Stone Co.* for the proposition that "an administrative rule that is issued pursuant to statutory authority has the force of law unless it is unreasonable or conflicts with a statute covering the same subject matter," 1994-Ohio-486, ¶ 22.

{¶ 27} But RPA's argument suffers from a fatal flaw: RPA does not assert, and there is no evidence in the record, that it ever attempted to serve discovery demands on the commission or its staff. Nor did RPA, before applying for rehearing, object to the commission's exemption of staff from discovery or argue that the commission rules purportedly exempting staff from discovery are unlawful. "A party's failure to challenge an alleged error constitutes a forfeiture of the objection because it deprives the board of an opportunity to cure any error when it reasonably could have." *In re Application of Black Fork Wind Energy, L.L.C.*, 2013-Ohio-5478, ¶ 19. Similarly, because RPA failed to serve staff with discovery—or even to argue in the proceedings below, before filing its application

for rehearing, that staff should be subject to discovery—RPA never presented the commission with the opportunity to determine the validity of any discovery requests.

{¶ 28} RPA did raise staff's exemption from discovery as one of its grounds for rehearing. But waiting to raise an objection to the commission's proceedings until the application for rehearing is fatal to RPA's claims. *See id.* at ¶ 20 ("Appellants' decision to wait until the rehearing stage to raise [an] objection is fatal to their claim."). By that point, the issue had been forfeited; therefore, RPA may not raise it here.

### 3. *RPA's reliance on the advice of counsel*

{¶ 29} The commission's rules require CRES and CRNGS providers to maintain records and data sufficient to verify their compliance with commission rules and to support any investigation of consumer complaints. Generally, such records shall be provided to staff within three business days of the request. *See* Adm.Code 4901:1-21-04 and 4901:1-29-04. During the commission's investigation of complaints against RPA, staff requested data and records related to phone calls that RPA's vendors made to consumers. RPA asserted that it did not have the requested records but, rather, its vendors did, and RPA refused to obtain the records from its vendors, on the advice of counsel. The commission found that RPA violated Adm.Code 4901:1-21-04(A) and 4901:1-29-04(A) when it refused to obtain and produce the records. 2023 Ohio PUC LEXIS 1037 at *60-61.

{¶ 30} RPA contends that the commission is unlawfully punishing it for relying on the advice of counsel and that "[a] layperson under active investigation by Commission enforcement staff cannot be expected to understand their rights and duties relative to Staff information requests[, which] is why they hire lawyers." But RPA cites little authority in support of its argument. It cites a court-of-appeals case holding that in some instances, a criminal defendant's guilty plea may be withdrawn if the defendant's lawyer inaccurately advised the defendant about the effect a

conviction would have on the defendant's immigration status. *See State v. Yahya*, 2011-Ohio-6090, ¶ 17 (10th Dist.) ("Within the context of [the criminal-justice] system, a defendant is entitled to rely on advice from counsel and trust that the advice is competent and accurate."). But a guilty plea in a criminal case involving potential deportation bears little relation to the contested administrative proceedings here.

{¶ 31} RPA also cites several Rules of Professional Conduct for the proposition that its counsel was required to act with "commitment and dedication to the interests of the client," Prof.Cond.R. 1.3, Comment 1, and was permitted to refuse a request on RPA's behalf so long as counsel had a good-faith belief that RPA was not required to comply with the request, *see* Prof.Cond.R. 3.4(c). The Rules of Professional Conduct, however, govern the lawyer's relationship with his client and the tribunal before which he is practicing. They do not provide that a represented party is not responsible for legal violations that may be committed when the party follows the advice of counsel. Indeed, taking RPA's argument at face value would allow a regulated utility to violate commission rules so long as its counsel interprets the rules differently from the commission. We reject RPA's argument that the commission punished RPA for relying on the advice of its counsel.

### 4. OCC's intervention

{¶ 32} OCC moved to intervene in the commission proceedings. RPA opposed the motion, but the commission granted it. RPA contends that the intervention was unlawful and prejudicial.

{¶ 33} We apply an abuse-of-discretion standard when reviewing the commission's permissive-intervention decisions. *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 2006-Ohio-5853, ¶ 17. We have previously espoused that "intervention ought to be liberally allowed so that the positions of all persons with

a real and substantial interest in the proceedings can be considered by the PUCO." *Id.* at ¶ 20.

{¶ 34} R.C. 4903.221 provides that "any . . . person who may be adversely affected by a public utilities commission proceeding may intervene in such proceeding," provided that the person files a motion to intervene within a specified time frame. When deciding applications to intervene, the commission shall consider the following:

> (1) The nature and extent of the prospective intervenor's interest;
> (2) The legal position advanced by the prospective intervenor and its probable relation to the merits of the case;
> (3) Whether the intervention by the prospective intervenor will unduly prolong or delay the proceedings; [and]
> (4) Whether the prospective intervenor will significantly contribute to full development and equitable resolution of the factual issues.

R.C. 4903.221(B); *see also* Adm.Code 4901-1-11. In this case, the commission considered these interests in deciding whether to grant OCC's motion to intervene. *See* 2022 Ohio PUC LEXIS 717 at *11.

{¶ 35} RPA argues, however, that OCC is not a person who may be "adversely affected" by the proceedings and that OCC has no statutory authority or interest in intervening in commission proceedings related to CRES or CRNGS providers. In support of its position, RPA relies on language from a court-of-appeals decision holding that OCC's jurisdiction is limited to proceedings before the commission and noting that before 2001, natural-gas marketers were not subject to the commission's jurisdiction. *See Tongren v. D&L Gas Mktg., Ltd.*, 2002-Ohio-

13

5006, ¶ 9, 20 (10th Dist.). But as also noted in that decision, in 2001, the General Assembly granted the commission jurisdiction over natural-gas marketers. *See id.* at ¶ 20; *see also* former R.C. 4929.20, Sub.H.B. No. 9, 149 Ohio Laws, Part II, 3857, 3879-3881. And when the legislature gave the commission jurisdiction over natural-gas marketers, it also gave OCC the right to represent consumers in proceedings before the commission related to natural-gas marketers. *See* R.C. 4929.24(C). OCC also has similar statutory authority to represent consumers in proceedings before the commission related to retail electric services. *See* R.C. 4928.16(C).

{¶ 36} RPA contends, however, that under R.C. 4928.16(C) and 4929.24(C), OCC's interest and authority is limited to representing consumers in cases in which either the consumer or OCC filed a complaint initiating the proceedings. It notes that here, the commission itself—not the consumers or OCC—initiated the investigation into RPA's activities. RPA is correct that R.C. 4928.16(C) and 4929.24(C) do not address OCC's authority to represent consumers in situations in which the commission initiated an investigation. But these statutes show that OCC has a general interest in representing residential consumers' interests in commission proceedings related to natural-gas and retail-electric-service providers. *See also* R.C. 4911.02(B)(2)(b) (OCC "[m]ay take appropriate action with respect to residential consumer complaints concerning quality of service, service charges, and the operation of the public utilities commission"). And there is no dispute that much, if not all, of RPA's conduct at issue here pertains to its interactions with residential consumers. Because residential consumers had interests that could be adversely affected by the commission's decision in this case, and because OCC is empowered to represent those interests, the commission did not abuse its discretion in granting OCC's motion to intervene.

14

**{¶ 37}** In sum, regarding RPA's first proposition of law, we conclude that the commission did not violate RPA's statutory and constitutional rights to due process.

## C. Evidence supporting the commission's findings of RPA's statutory and rule violations

**{¶ 38}** Under its second proposition of law, RPA argues that the commission's findings that RPA violated statutes and commission rules are not supported by the record, are against the manifest weight of the evidence, and are contrary to law. We will not disturb the commission's factual determinations when the record contains sufficient probative evidence showing that the commission's decision is not manifestly against the weight of the evidence and not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 2004-Ohio-6869, ¶ 29.

### 1. Misrepresenting a price advantage

**{¶ 39}** Adm.Code 4901:1-21-05(B)(8)(a) provides that unfair, deceptive, or unconscionable acts or practices in a CRES provider's advertising or marketing include making offers that "[c]laim that a specific price advantage, savings, or guarantee exists if it does not." Adm.Code 4901:1-29-05(D)(8)(a) provides similarly for CRNGS providers. The commission found that RPA violated these rules by making false representations to consumers regarding prices, savings, and guarantees. For example, the commission found that RPA violated commission rules when an agent of RPA told a consumer that she would receive a $50 gift card but then later told the consumer that she would instead receive $50 in unspecified rewards and that enrolling with RPA would save her 30 or 40 percent on her electric bill. These representations regarding prices, savings, and guarantees were untrue. 2023 Ohio PUC LEXIS 1037 at *28-29, 46-51.

**{¶ 40}** RPA argues that these misrepresentations do not qualify as rule violations, because they were made orally. It argues that the parol-evidence rule bars claims based on CRES and CRNGS providers' oral representations that conflict with the terms of a written agreement. In support of its argument, RPA cites *Williams v. Spitzer Autoworld Canton, L.L.C.*, in which we held that in cases brought under the Consumer Sales Practices Act, "absent proof of fraud, mistake, or other invalidating cause, a consumer may not present extrinsic evidence contradicting the parties' final written contract to prove a violation of that act," 2009-Ohio-3554, paragraph two of the syllabus. RPA notes that its written contracts state that the consumer is entering into a variable-price agreement and that the "price may not provide a savings relative to the [default-utility] rate." We find this argument unpersuasive.

**{¶ 41}** The parol-evidence rule is "'a rule of substantive law that prohibits a party who has entered into a written contract from contradicting the terms of the contract with evidence of alleged or actual agreements.'" *Williams* at ¶ 14, quoting *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 1996-Ohio-194, ¶ 28; *see also* R.C. 1302.05. Here, the commission did not find that the terms of RPA's contracts were modified by RPA's oral representations to consumers. Rather, the commission found that RPA, when marketing its services, falsely represented that a specific price advantage, savings, or guarantee exists and that such misrepresentations are prohibited by Adm.Code 4901:1-21-05(B)(8)(a) and 4901:1-29-05(D)(8)(a).

**{¶ 42}** This court's decision in *Williams* does not support RPA's position. In *Williams*, we partially invalidated an administrative rule that had been adopted by the attorney general, which provided that an automobile dealer violated the Consumer Sales Practices Act "if it fail[ed] to integrate all oral representations and promises made prior to obtaining the consumer's signature on the written contract into that contract." *Williams* at ¶ 19. Proving a violation of the rule would necessarily require evidence of the oral representations made regarding the terms

of the agreement, the introduction of which is generally prohibited by the parol-evidence rule. *See* R.C. 1302.05. We held in *Williams* that the parol-evidence rule unconstitutionally usurps the General Assembly's authority to declare the policy of the State. *Williams* at paragraph one of the syllabus. RPA argues that the commission's rules do the same here. We disagree. The commission's rules prohibit certain marketing practices as "unfair, misleading, deceptive, or unconscionable," Adm.Code 4901:1-21-05(B) and 4901:1-29-05(D); they do not address a CRES or CRNGS provider's failure to integrate oral representations made to consumers into a written contract. The reasoning applied in *Williams* is inapplicable here.

**{¶ 43}** In addition, RPA advertised that it offers consumers a "competitive" rate. Staff recommended in its amended report that the commission find that by advertising its rates as "competitive," RPA violated Adm.Code 4901:1-21-05(B)(8) and 4901:1-29-05(D)(8) because its rates were often higher than the default-utility rate. RPA argues that advertising its rates as "competitive" is mere puffery and not a claim that a specific price advantage, savings, or guarantee exists. *See, e.g.*, *Corsale v. Sperian Energy Corp.*, 412 F.Supp.3d 556, 563 (W.D.Pa. 2019) (concluding that with regard to a utility's advertising, "a vague claim of 'competitive' rates is puffery and, therefore, not actionable"). Notably, the commission did not issue any findings that RPA's advertisement of its rates as "competitive" constituted a rule violation. RPA presents an argument about something that the commission never found, and therefore, we need not address it.

*2. Modifying call recordings*

**{¶ 44}** When a CRES or CRNGS provider enrolls a new consumer through door-to-door solicitation, the provider is required to have an independent third party verify the enrollment. Adm.Code 4901:1-21-06(D)(1)(h) and 4901:1-29-06(D)(6)(b). Essentially, the third party calls the consumer to confirm that he or she wants to enroll with the provider and makes a recording of the call. *See*

17

Adm.Code 4901:1-21-06(D)(1)(h) and 4901:1-29-06(D)(6)(b). These are known as "TPV recordings." Here, staff requested TPV recordings from RPA as part of its investigation, and the commission found that RPA provided staff with altered or falsified recordings. The commission determined that by providing these altered or falsified recordings, RPA had violated Adm.Code 4901:1-21-05(B)[3] and 4901:1-29-05(D), which prohibit CRES and CRNGS providers, respectively, from engaging in "unfair, misleading, deceptive, or unconscionable" practices related to the marketing, solicitation, or sale of their services. *See* 2023 Ohio PUC LEXIS 1037 at *51.

{¶ 45} RPA does not dispute that at least some of the recordings it provided to staff were altered or falsified. Rather, RPA argues that its *vendors* modified the recordings in an attempt to defraud RPA. RPA asserts that the vendors were paid by commission for each new enrollment and that they altered the recordings to increase their commissions. Accordingly, RPA argues that these actions did not constitute unfair, deceptive, misleading, or unconscionable marketing or sales practices on its part. We disagree.

{¶ 46} Contrary to RPA's assertion, such actions also undoubtedly harmed consumers. For example, one recording was modified or falsified to replace the consumer's voice with a different person's voice. By modifying or falsifying the recording, the vendor was able to support its enrollment of that consumer for a service with RPA that the consumer did not actually agree to.

### 3. Signing consumer contracts

{¶ 47} After a consumer's third-party verification was completed, RPA would electronically place the consumer's initials or signature on the contract and mail the consumer a copy of the contract. Several consumers testified at the hearing that they did not agree to let RPA place their signature on the contract. The

---

3. The order states that RPA violated Adm.Code 4901:1-21-05(C). This appears to be a mis-cite.

commission found that the evidence showed that RPA had forged the signatures or otherwise placed them on the contracts without the consumers' consent and that doing so constituted unconscionable practices in violation of Adm.Code 4901:1-21-05(B)[4] and 4901:1-29-05(D). *See* 2023 Ohio PUC LEXIS 1037 at *51-52.

{¶ 48} RPA argues that electronically placing a consumer's initials on a contract "is a common business practice in a world where consumers routinely enter contracts over the phone or online, as opposed to driving to a brick-and-mortar location and signing a contract." RPA offered no evidence during the commission proceedings in support of this assertion, but even if it is a common business practice, RPA misunderstands the commission's order. The commission did not hold that a CRES or CRNGS provider's placement of a consumer's initials on a contract is *always* a violation of commission rules. Rather, the commission found that certain consumers did not agree to enter into a contract with RPA, a finding that was supported by evidence presented at the hearing. Because they are supported by sufficient probative evidence, we do not disturb the commission's findings that RPA engaged in unconscionable acts or practices in violation of commission rules by signing consumers' names or initials to contracts that the consumers had not agreed to.

### 4. Spoofing

{¶ 49} The commission found that RPA "spoofed" its phone number, an act that involves causing its phone number to appear to be a different person or entity's number. The commission found that RPA had spoofed its phone number to resemble Duke Energy's various numbers. In addition, the commission found that RPA had spoofed its number during one call to appear similar to a consumer's local high school number and to resemble the consumer's own personal number for another call. *See* 2023 Ohio PUC LEXIS at *52-54.

---

4. The order states that RPA violated Adm.Code 4901:1-21-05(C). This appears to be a mis-cite.

{¶ 50} Adm.Code 4901:1-21-05(B)(10) prohibits CRES providers from "[e]ngaging in any solicitation that will lead the customer to believe that the CRES provider is soliciting on behalf of or is an agent of any entity other than the CRES provider." Similarly, Adm.Code 4901:1-29-05(D)(5) prohibits CRNGS providers (and governmental aggregators) from "[e]ngaging in any solicitation that leads the customer to believe that the retail natural gas supplier or governmental aggregator or its agent is soliciting on behalf of or is an agent of any entity other than the competitive retail natural gas supplier or governmental aggregator." The commission found that RPA's spoofing violated these rules. *See* 2023 Ohio PUC LEXIS 1037 at *53.

{¶ 51} RPA argues that the rules do not explicitly prohibit spoofing. RPA is correct, but the rules do proscribe CRES and CRNGS providers from engaging in behavior that would be misleading to consumers. The commission found that RPA had spoofed its number to resemble various phone numbers of Duke Energy, and we agree with the commission that that act falls within the proscription of the rules. The commission thus did not abuse its discretion in determining that RPA's use of phone numbers generally associated with an electric-utility provider was a practice that would lead consumers to believe that RPA was soliciting on behalf of, or acting as an agent of, Duke Energy. Indeed, RPA has not offered any explanation for why it would spoof its numbers other than to make the recipient of the call think that Duke Energy was calling. Whether spoofing a consumer's local high school number would lead a consumer to believe that RPA was soliciting on behalf of, or was acting as an agent of, the school is a closer question. But a consumer could reasonably believe that a call from a number similar to their local high school's would be related to the school. Consequently, we conclude that the commission did not abuse its discretion in determining that RPA violated commission rules when spoofing its number in this way.

{¶ 52} RPA also argues that even if it did spoof its number, it did not engage in a pattern of doing so as found by the commission. This argument fails for two reasons. First, the rules prohibit CRES and CRNGS providers from engaging in unfair, deceptive, or unconscionable "acts or practices," but they do not require that those acts or practices be performed as part of a pattern. *See* Adm.Code 4901:1-21-05(B); Adm.Code 4901:1-29-05(D). The acts themselves are sufficient. Second, although the commission pointed to only RPA's spoofing of Duke Energy's numbers, a consumer's local high school number, and a consumer's own number, the commission found that RPA had engaged in those acts over several years. The evidence before the commission bore out those findings. Accordingly, because they are supported by sufficient probative evidence, we do not disturb the commission's findings that RPA violated Adm.Code 4901:1-21-05(B) and 4901:1-29-05(D) by spoofing its phone number.

### 5. *Third-party-verification violations*

{¶ 53} The commission found that RPA's third-party-verification process violated several commission rules.

{¶ 54} Adm.Code 4901:1-21-06(D)(1)(h)(ii) and 4901:1-29-06(D)(6)(b)(ii), respectively, require that the sales agent for the CRES or CRNGS provider not be present during the third-party-verification call. The commission found that during one such call—in consumer case No. 00682929—the sales agent remained at the consumer's premises. *See* 2023 Ohio PUC LEXIS 1037 at *55-57. RPA argues that the evidence does not support this finding. We agree with RPA. The evidence related to this consumer does not indicate that the sales agent remained at the consumer's premises during the third-party-verification call. At most, the evidence indicates that the sales agent directed the consumer to make a call to verify his or her enrollment, but it does not show that the call made by the consumer was to the third-party verifier (generally, the third-party verifier calls the consumer, not vice versa) or that the sales agent was present during the call. The

commission found that the TPV recording associated with this consumer shows that the sales agent was present during the third-party-verification call, *see id.* at \*56, but the TPV recording is not in the record, and thus we cannot confirm that the evidence before the commission provided support for this finding. Based on the evidence in the record, we conclude that the commission abused its discretion in finding that the sales agent was present during this consumer's third-party-verification call.

**{¶ 55}** Commission rules also require that the third-party verifier disclose certain information during the calls. The commission found that RPA's third-party verifier did not disclose this information during it calls to consumers. *See id.* at \*55-57. We agree.

**{¶ 56}** The third-party verifier is required to notify the consumer and obtain the consumer's acknowledgement that the provider "will, within one business day, send the customer a written contract that details the terms and conditions that were summarized in the telephone call," Adm.Code 4901:1-21-06(D)(2)(a)(vii) and 4901:1-29-06(E)(1)(g). As demonstrated by the TPV recordings in the record, RPA's third-party verifier did not provide the required notification or obtain the required acknowledgment. Although in some of the calls the third-party verifier stated that RPA would send the consumer a copy of the contract, during some calls the third-party verifier stated that the contract would be sent in five days, while in others, the third-party verifier did not provide a time frame at all. RPA argues that it is immaterial whether the third-party verifier told consumers that RPA would send the contract within five days, so long as RPA actually sent the contract within one day. But that is not what the rules require; the rules expressly require that the third-party verifier tell the consumer that the CRES or CRNGS provider will send the contract within one day. *See* Adm.Code 4901:1-21-06(D)(2)(a)(vii) and 4901:1-29-06(E)(1)(g).

{¶ 57} The third-party verifier must also disclose and obtain the consumer's acknowledgement of the price per unit of the service. *See* Adm.Code 4901:1-21-06(D)(2)(a)(vi)(b) and 4901:1-29-06(E)(1)(f)(ii). In some of the TPV recordings, the third-party verifier did not disclose the price information. Additionally, the third-party verifier is required to notify the consumer and obtain the consumer's acceptance of any fees or costs that will be charged to the consumer for the electric or gas service. *See* Adm.Code 4901:1-21-06(D)(2)(a)(vi)(g) and 4901:1-29-06(E)(1)(f)(vii). RPA charges a $5 monthly fee for its services, and in some of the TPV recordings, the third-party verifier did not disclose this information.

{¶ 58} We conclude that the commission's finding that the third-party verifier did not comply with commission rules when it failed to notify consumers of (1) the time frame in which RPA would send them the contracts, (2) the price of the service the consumer would be receiving from RPA, and (3) the $5 monthly fee that RPA would charge the consumer is supported by sufficient probative evidence. Therefore, we do not disturb this finding.

### 6. Lacking managerial capability

{¶ 59} R.C. 4928.08(B)(1) provides that no CRES provider may provide service without "first being certified by the public utilities commission regarding its managerial, technical, and financial capability to provide that service." R.C. 4929.20(A)(1) provides similarly for CRNGS providers.

{¶ 60} The commission found that RPA failed to show sufficient managerial capability to provide its services for two reasons.

{¶ 61} First, during the early stages of the COVID-19 pandemic, the commission prohibited CRES and CRNGS providers from soliciting consumers door-to-door. *See In re the Proper Procedures and Process for the Commission's Operations and Proceedings During the Declared State of Emergency and Related Matters*, PUCO No. 20-591-AU-UNC, 2020 Ohio PUC LEXIS 305, *5 (Mar. 17, 2020). In June 2020, the commission allowed CRES and CRNGS providers to

resume door-to-door solicitation but ordered them to notify the commission at least 48 hours before doing so of the times, dates, duration, and locations where they intended to engage in door-to-door solicitations. *In re the Proper Procedures and Process for the Commission's Operations and Proceedings During the Declared State of Emergency and Related Matters*, PUCO Nos. 20-591-AU-UNC and 20-1040-GE-UNC, 2020 Ohio PUC LEXIS 1053, *11 (June 17, 2020).

{¶ 62} In this case, the commission found that in numerous instances, RPA or its agents solicited consumers door-to-door without first providing proper notice to the commission. *See* 2023 Ohio PUC LEXIS 1037 at *58. RPA does not dispute that it failed to provide proper notice to the commission.

{¶ 63} Second, the commission found that RPA lacked managerial capability because it did not maintain records sufficient for the commission to verify its compliance with commission rules and service standards. *See id* at *61. As discussed above, Adm.Code 4901:1-21-04 and 4901:1-29-04 require CRES and CRNGS providers, respectively, to maintain such records. During the commission's investigation, staff requested from RPA data and records related to phone calls that its vendors made to consumers. RPA informed the commission that it did not have these records but, rather, its vendors did.

{¶ 64} RPA argues that Adm.Code 4901:1-21-04 and 4901:1-29-04 cannot "be rationally interpreted to require a supplier to create, maintain, or produce records about the back-office operations of its vendors." We reject this argument. RPA is required to maintain records sufficient for the commission to "[v]erify its compliance with the requirements of any applicable commission rules" and "[s]upport any investigation of customer complaints," Adm.Code 4901:1-21-04(A) and 4901:1-29-04(A). Although RPA's vendors are the entities that directly solicited the consumers, they did so on behalf of RPA. And it is RPA, not RPA's vendors, that was certified by the commission to be a CRES and CRNGS provider. Because RPA is unable to provide documentation showing that its vendors were

24

complying with the commission's rules, RPA is unable to document that *it* complied with the rules.

### D. Remedies

**{¶ 65}** The commission ordered three remedies, and RPA challenges all of them under its third proposition of law.

### 1. Recission of RPA's operating certificates

**{¶ 66}** The commission may rescind the certification of any CRES provider "if the commission determines, after reasonable notice and opportunity for hearing that the [provider] has failed to comply with any applicable certification standards or has engaged in anticompetitive or unfair, deceptive, or unconscionable acts or practices in this state." R.C. 4928.08(D). R.C. 4929.20(C)(1) provides similarly for CRNGS providers. In addition, R.C. 4928.08(B)(1) states that no CRES provider may provide service to consumers without "first being certified by the public utilities commission regarding its managerial, technical, and financial capability to provide that service." R.C. 4929.20(A)(1) provides similarly for CRNGS providers.

**{¶ 67}** Based on the numerous violations that RPA committed, the commission ordered that RPA's operating certificates be rescinded and that RPA cease operations in Ohio. *See* 2023 Ohio PUC LEXIS 1037 at *64-66. RPA argues that the commission's rescission order is arbitrary, unjustified, and excessive. Based on the evidence in the record, we conclude that the commission did not abuse its discretion when it rescinded RPA's operating certificates. As discussed above, the evidence supports the commission's findings that RPA committed numerous unfair, deceptive, or unconscionable acts or practices and that it lacked managerial capability. These statutory and rule violations harmed consumers, and the commission did not abuse its discretion in determining that RPA should no longer be able to operate in Ohio.

*2. Forfeiture*

{¶ 68} The commission also ordered RPA to pay a $1.44 million forfeiture to the general-revenue fund. *See* R.C. 4905.54 (forfeitures shall be credited to the general-revenue fund). It ordered RPA to pay $1 million immediately and held in abeyance the remaining forfeiture order pending RPA's rerating of its consumers, noting that if RPA timely rerated the consumers, the remaining forfeiture would be waived. *See* 2023 Ohio PUC LEXIS 1037 at *62-64, 69.

{¶ 69} R.C. 4903.09 requires the commission to file "findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact." "The purposes behind R.C. 4903.09's requirements are straightforward. For a reviewing court to do its job, it needs to have enough information to know how the commission reached its result." *FirstEnergy Advisors*, 2021-Ohio-3630, at ¶ 21. This court has long held that when "the commission has not set forth in its order its reasons in sufficient detail to enable [this court], upon appeal, to determine how the commission reached its decision, the order will be set aside." *Gen. Tel. Co. v. Pub. Util. Comm.*, 30 Ohio St.2d 271, 277 (1972); *see also FirstEnergy Advisors* at ¶ 21. RPA challenges the forfeiture order on the ground that the commission did not adequately explain the reasons for, or the evidence supporting, the forfeiture or identify the number of violations on which the forfeiture is based. We agree with RPA on this issue. We therefore reverse the forfeiture order and remand this matter to the commission.

{¶ 70} The commission may assess a forfeiture of not more than $10,000 for each violation of or failure to comply with a statutory requirement set forth in R.C. Ch. 4901, 4903, 4907, and 4909 and any requirement set forth by commission rule. R.C. 4905.54. "Each day's continuance of the violation or failure is a separate offense." *Id.* Here, the commission was vague in its order about how it determined the forfeiture amount. According to the order, the commission relied on staff testimony that RPA had committed "over 150 violations"; it then appears to have

multiplied 150 violations by the maximum forfeiture amount of $10,000 per violation per day (although the order does not explicitly state that it is doing so). *See* 2023 Ohio PUC LEXIS 1037 at *62-63. The commission then reduced the forfeiture amount by $60,000 because it determined that one category of six alleged violations—related to RPA's claims about offering "100% renewable energy"— were not violations (although the order does not clarify how it determined that there were six violations). *See id.* Subtracting $60,000 from $1.5 million results in a forfeiture amount of $1.44 million.

{¶ 71} The "over 150 violations" that the commission based the forfeiture on are not clearly identified in the commission's order, and we are unable to discern from the record which violations the order refers to. At the hearing, a staff member testified that staff "had 78 specific audio files or cases that [staff] believed should be before the Commission for the Commission to determine if there, in fact, was a rule violation." The staff member then testified that each consumer complaint presented "at least two egregious violations." The hearing examiner then asked, "How many discreet counts of violations are you alleging?" to which the staff member responded, "It's like 158 or -56, something like that." The staff member referred to a spreadsheet attached to her prefiled testimony, which she said "lays out each case that [staff] found issues with and what rule violation [staff] believe[s] . . . was found in that individual case or sales call." The staff member in her testimony, and ultimately the commission in its order, relied almost exclusively on this spreadsheet when identifying the approximately 150 violations on which the forfeiture is based.

{¶ 72} However, it is essentially impossible to determine from the spreadsheet which specific violations the commission found. The spreadsheet contains 75 rows of case numbers and 48 columns of what appear to be violation categories (although the columns for each violation category do not include a statute or rule reference). Each field is either blank with a white background, blank

with a grey background, contains a green checkmark, or contains a red "X." The spreadsheet does not contain a key, so it is impossible to know what each field means. Nor does the spreadsheet contain a row or column calculating the total number of red X's or green checkmarks.

{¶ 73} From our review of the spreadsheet, we cannot determine how staff identified each specific violation. Neither the red X's nor the green checkmarks tally close to 150 violations. Arguably, the 150 violations could be based on staff's testimony that each case contained at least two egregious violations, but two of these cases have neither red X's nor green checkmarks. And if we make the perhaps logical assumption that a violation is indicated by a red X, at least one additional case does not include any red X's and approximately 13 more have only one red X.

{¶ 74} In sum, based on the spreadsheet, it is impossible for us to determine how the commission calculated the total number of violations. And the spreadsheet and the staff testimony about the violations are the only evidence the commission cited in its order when discussing the total number of violations found and how it connected those violations to the amount of the forfeiture. In addition, as discussed above, we agree with RPA that the commission's findings regarding one of the alleged violations—that a sales agent remained at a consumer's premises during a third-party-verification call—is not supported by the evidence. Because it is impossible for us to determine how the number of violations was calculated by the commission and applied to the forfeiture order, we are likewise unable to reduce the forfeiture to account for that unsupported finding.

{¶ 75} Because "the commission has not set forth in its order its reasons in sufficient detail to enable [this court], upon appeal, to determine how the commission reached its decision," *Gen. Tel. Co.*, 30 Ohio St.2d at 277, we find that the commission's forfeiture order violates R.C. 4903.09.

{¶ 76} In a previous case in which we found that a commission order did not comply with R.C. 4903.09, we remanded the matter to the commission and

directed the commission to "thoroughly explain its conclusion" and "identify the evidence it considered to support its findings," *Ohio Consumers' Counsel v. Pub. Util. Comm.*, 2006-Ohio-5789, ¶ 36. We do so here as well and direct the commission to identify and thoroughly explain the evidence it used to support the ordered forfeiture.

### 3. Rerating consumers

{¶ 77} When the commission brings a complaint against a CRES provider under R.C. 4928.16(A), it may, after reasonable notice and opportunity for hearing, "[o]rder rescission of a contract, or restitution to customers including damages due to electric power fluctuations." R.C.4928.16(B)(1). R.C. 4929.24(B) provides similarly with regard to complaints brought by the commission against CRNGS providers.

{¶ 78} In its order, the commission directs RPA to rerate its consumers. 2023 Ohio PUC LEXIS 1037 at *1, 66. RPA argues that the order is unsupported and unlawful for several reasons.

{¶ 79} We note that although the parties appear to understand what it means to "rerate" consumers, the commission did not explicitly define the term in its order. In its merit brief, RPA describes the term as requiring RPA to (1) "cancel [the consumers'] contracts" with RPA and (2) "issue [the consumers] refunds for the difference between the monthly variable rate [they] agreed to pay [to RPA] and the default rate their utility would have charged." The commission does not dispute this definition, so we accept it for purposes of this opinion.

{¶ 80} The commission ordered RPA to rerate its consumers even if the consumer did not file a complaint with the commission. RPA contends that the commission lacks authority to order it to rerate consumers who did not file complaints. We disagree. R.C. 4928.16(A) and 4929.24(A) provide that the commission may bring its own complaint; it is not limited to hearing complaints brought by consumers. R.C. 4928.16(B) and 4929.24(B) also provide that the

commission may order recission or restitution for consumers "in any complaint brought pursuant to" R.C. 4928.16(A) and 4929.24(A), respectively. The commission's authority to order recission or restitution is not explicitly limited to actions arising from complaints brought by consumers, and nothing in the statutes suggests that the commission is limited to ordering recission or restitution for only those consumers who filed complaints.

{¶ 81} RPA also argues that the commission cannot order it to *both* return consumers to their original rates with their default-utility provider *and* refund consumers for the difference between the monthly variable rate they paid to RPA and what they would have paid to their default-utility provider. It notes that R.C. 4928.16(B)(1) and 4929.24(B)(1) provide that the commission may "[o]rder rescission of a contract, *or* restitution to customers" (emphasis added), and it argues that the statutes' use of "or" means that the commission must choose either rescission or restitution. We disagree with RPA's statutory interpretation.

{¶ 82} The use of "or" in a statute is not always disjunctive. Rather, "'[a]nd' may be read 'or,' and 'or' may be read 'and' if the sense requires it." R.C. 1.02(F). In addition, R.C. 4928.16(B) and 4929.24(B) provide that the commission "may do any of the following," indicating that the commission may order both rescission of consumer contracts and payment of restitution to consumers. Indeed, it would be odd if the commission were unable to order rescission of a contract yet could award restitution to a consumer for harms arising from that very contract. Here, the context of the statutes conveys that this court should interpret the use of "or" as allowing the commission to order both recission and restitution. If RPA were required to return consumers to their original default-utility rates but were allowed to keep the profits it gained from consumers as a result of its illegal actions, the consumers would not be made whole.

{¶ 83} We conclude, therefore, that the commission did not abuse its discretion in ordering RPA to rerate consumers.

{¶ 84} As RPA points out, however, the commission appears to have ordered rerating of consumers for contradictory periods. The commission first directs RPA to rerate all consumers "enrolled between January 1, 2021 and July 20, 2021," 2023 Ohio PUC LEXIS 1037 at *1, but subsequently orders RPA to rerate consumers enrolled for the slightly longer period of "January 2021 to July 2021," *id.* at *43. The commission also orders RPA to rerate any consumers "enrolled through door-to-door [solicitation] or telemarketing between May 1, 2021, and June 30, 2021," and to rerate all consumers who "filed a complaint with any entity disputing enrollment with RPA starting from February 1, 2022," *id.* at *66. It is unclear from the commission's order which periods are appropriate for rerating consumers. Although we affirm the commission's authority to order consumer rerating, we remand this matter to the commission with instructions to clarify which consumers it is ordering RPA to rerate.

### III. CONCLUSION

{¶ 85} The commission properly found that RPA committed numerous unfair, deceptive, or unconscionable acts or practices that harmed consumers and that RPA lacked managerial capability. As a result, the commission did not err in rescinding RPA's operating certificates, and we affirm that portion of the commission's order.

{¶ 86} However, the commission did not adequately explain the reasons for or the evidence supporting its forfeiture order. Therefore, we reverse the commission's forfeiture order and remand this matter to the commission with instructions to identify and thoroughly explain the evidence used to support the amount of the forfeiture.

{¶ 87} In addition, while we conclude that the commission generally has the authority to order that RPA rerate its consumers, its order is unclear as to which consumers it is ordering RPA to rerate. We reverse that portion of the

commission's order and remand the matter to the commission with instructions to clarify which consumers it is ordering be rerated.

{¶ 88} Accordingly, the commission's order is affirmed in part and reversed in part, and this matter is remanded for further consideration as herein instructed.

Order affirmed in part
and reversed in part
and cause remanded.

_____

Whitt Sturtevant, L.L.P., Mark A. Whitt, and Scott Elmer, for appellant.

Dave Yost, Attorney General, John H. Jones, Public Utilities Section Chief, and Rhiannon Howard and Janet Gregory, Assistant Attorneys General, for appellee.

Maureen R. Willis, Ohio Consumers' Counsel, and Angela D. O'Brien, Deputy Consumers' Counsel, for intervening appellee.

_____